**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3353
_____

CHA LIANG,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA
_____

On Petition for Review of a Decision of the
Board of Immigration Appeals
(No. A201-123-167)
Immigration Judge: Amit Chugh
_____

Argued: July 7, 2021

Before: AMBRO, JORDAN, and BIBAS, *Circuit Judges*.

(Filed: October 12, 2021)
_____

David Yan                [ARGUED]
LAW OFFICES OF DAVID YAN
3606 30th Street, Suite 11E
Long Island City, NY 11106
    *Counsel for Petitioner*


Lance L. Jolley          [ARGUED]
Anthony C. Payne
U.S. DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
    *Counsel for Respondent*

————————————

OPINION OF THE COURT

————————————

BIBAS, *Circuit Judge*.

Divide and conquer is a good military strategy but a bad judicial one. Judges must consider how related facts weave together into a narrative.

Chinese officials caught Cha Liang practicing his faith, so they beat, jailed, and then threatened him. When he sought asylum, the Board of Immigration Appeals minimized the threats and physical abuse as discrete incidents. But Liang's twenty-minute beating and fifteen days in jail made the later threats

more menacing. Because the Board should not have ignored this context, we will grant the petition and remand.

## I. BACKGROUND

Liang is from China. In 1997, he learned that his then-girlfriend (now wife) was expecting their child. But because they had not yet married, Chinese government officials forced her to abort their baby. To protest the forced abortion, Liang met with a local official. A scuffle ensued. It ended when a security guard slammed a door on his hand, scarring it.

Shattered, Liang found solace in Christianity. He began attending underground church meetings. In 2000, Chinese police burst into an underground-church meeting and declared it an illegal religious gathering. They arrested several people, including Liang, and brought them to the police station.

At the station, the police abused Liang. They stripped him down to his underpants. They bent him over and cuffed his hands behind his back. Then, they beat him. They held him by his hair and struck him in the face and ears. They pounded his back and legs. They pummeled him so hard, for twenty minutes, that he suffers hearing loss to this day. After that, they locked him in a cold cell, gave him little to eat, and kept him there for fifteen days.

Before letting Liang go, the police warned him: if we catch you in church again, we will throw you back in jail. Once out, Liang kept going to church. But to avoid the police, the group met less often and constantly changed where it gathered.

Almost a decade later, Liang fled to the United States. He sought asylum, claiming both political persecution (based on the 1997 scuffle over the forced abortion) and religious persecution (based on the 2000 arrest, beating, jailing, and threats). At the hearing, the government seemed to concede past persecution. In challenging Liang's credibility, the government's lawyer said he "would certainly not argue that" the 2000 incident, if true, was not persecution. AR 210. Though the immigration judge found Liang credible, he found that he had not been persecuted. He did not mention the government's apparent concession.

The Board of Immigration Appeals affirmed. It noted that Liang had opposed China's coercive abortion policy. And it construed his opposition as a political opinion. But having a door slammed on his hand, it held, was not severe enough to count as persecution.

The Board also rejected his religious-persecution claim because Liang's ordeals in 2000 were not "sufficiently egregious." AR 4. It suggested that his mild hearing loss was not "sufficiently 'severe.'" *Id.* (quoting *Kibinda v. Att'y Gen.*, 477 F.3d 113, 119–20 (3d Cir. 2007)). It also held that the threat of rearrest was not "concrete and menacing" enough to count as persecution because he kept going to church for nine more years. AR 4 (quoting *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 108 (3d Cir. 2020)).

Finally, the Board held that Liang's fear of future persecution was not well-founded. After his 2000 jailing, he had no more trouble with the authorities. True, Liang submitted five letters from people in China telling him that if he returned, he

4

would be arrested. But, it found, the letters were identical and too vague to credit. The Board also denied his claims under the Convention Against Torture and for withholding of removal.

Liang challenges only the denial of asylum. He argues that the immigration judge had to accept the government's concession of past persecution. In any event, he challenges the Board's rulings on past and future persecution.

"[W]e appl[y] de novo review to the question of whether the [Board] misapprehended the legal methodology we have prescribed for assessing persecution." *Thayalan v. Att'y Gen.*, 997 F.3d 132, 137 n.1 (3d Cir. 2021).

## II. THE BOARD'S PAST-PERSECUTION ANALYSIS WAS FLAWED

The Board held that Liang had suffered neither political nor religious persecution in China. It was right about political persecution, but its reasons for rejecting religious persecution were flawed. Because that is clear, we need not address Liang's argument that the government's statement was a concession that should have swayed the immigration judge.

### A. Political Persecution

As the Board rightly held, the 1997 door-slamming incident did not rise to the level of persecution. Liang suffered only a minor injury to his hand. This "scuffle with the local officials does not appear to have been serious." *Chen v. Ashcroft*, 381 F.3d 221, 235 (3d Cir. 2004).

Liang responds that the Board had to consider this experience together with his later beating and jailing. To be sure, the agency errs when it considers related mistreatment "in isolation." *Herrera-Reyes*, 952 F.3d at 108. But these incidents were at best tenuously related. In 1997, Chinese authorities harmed Liang because of his political stance against forced abortion; in 2000, because of his faith. Neither event relates enough to the other. So the Board did not need to look at them together to determine past persecution.

## B. Religious Persecution

The Board also rejected his claim of religious persecution. It considered his beating and jailing together and dismissed that "single incident" as not "sufficiently egregious." AR 4. Then, it moved to the threats, which it found not "concrete and menacing" enough. *Id.* After all, the Board stressed, they failed to deter Liang from practicing his faith.

The Board's reasoning, though, ignores the context of the threats. Government officials threatened to jail Liang if he went to church again. He had good reason to take the threat seriously, as he had just been jailed and beaten. A "threat [can be] made concrete by the violent context in which it occurred." *Herrera-Reyes*, 952 F.3d at 108. By ignoring that context, the Board failed to "examine incidents of alleged past persecution … cumulatively." *Thayalan*, 997 F.3d at 137 n.1.

True, the Board purported to consider the episodes "cumulatively." AR 4. But "[a] cursory invocation of the word 'cumulative' is insufficient." *Herrera-Reyes*, 952 F.3d at 109. Here, the opinion shows that the Board did not do what it said

6

it did. It analyzed the threat separately from the beating and jailing and did not consider how the preceding violence put steel into the threat.

On remand, the agency must consider the threats in light of the earlier abuse. *Id.* Then, it must decide whether the "aggregate effect" of the beating, jailing, and threats "pose[d] a 'severe affront[] to [Liang's] life or freedom.'" *Id.* at 110 (quoting *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 341 (3d Cir. 2008)). If the Board holds that the beating, jailing, and threats together count as past persecution, it must presume that Liang will face future persecution if he returns. 8 C.F.R. § 208.13. Then it will have to consider whether the evidence rebuts that presumption.

\* \* \* \* \*

We do not say whether Liang ultimately suffered past religious persecution or has a well-founded fear of future persecution. But it is not enough for the Board to reach a particular destination. It must also take the right path to get there. By not considering religious persecution cumulatively, it "misapprehend[ed] applicable law." *Thayalan*, 997 F.3d at 137 n.1. So we will grant the petition and remand.

JORDAN, *Circuit Judge*, with whom AMBRO, *Circuit Judge*, joins, concurring.

While I fully concur in the opinion we issue today, I write separately to highlight one important point that bears on our standard of review and should not be obscured by our various formulations of the standard over the years:  Past persecution is a mixed question of law and fact.[1]  That is because the determination of "past persecution" involves two distinct questions, either or both of which may be disputed in a given case.  The question of what events occurred or may occur "is factual in nature and is subject to clearly erroneous review by the BIA" and substantial evidence review by this Court; while the question of "whether those events meet the legal definition of persecution [] is reviewed *de novo* because it is plainly an issue of law."  *Huang v. Att'y Gen.*, 620 F.3d 372, 379, 383 (3d Cir. 2010).  As the Supreme Court has repeatedly – and, again, just recently – described, we approach a question "which has both factual and legal elements, as a mixed

---

[1] Quoting our recent decision in *Thayalan v. Att'y Gen.*, 997 F.3d 132 (3d Cir. 2021), the lead opinion today frames the standard of review as follows: "[W]e appl[y] de novo review to the question of whether the [Board] misapprehended the legal methodology we have prescribed for assessing persecution." Maj. op. at 5 (quoting *Thayalan*, 997 F.3d at 137 n.1).  I agree with that sentence, but, as described herein, I have concerns that *Thayalan* can be misread.  To the extent the opinion in that case can be understood to hold that past persecution is a pure question of fact or that a misapprehension of law by the BIA is a prerequisite to assessing de novo whether the facts in a given case amount to persecution, I believe it to be contrary to preexisting precedent.

question of law and fact," while we treat "the application of a legal standard to undisputed or established facts" as a question of law. *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (quotation omitted). In keeping with that instruction, we should be more consistent in acknowledging that past persecution is a mixed question and more explicit in identifying which component, factual or legal, is under review.

That breakdown of the two components is critical if we are to apply the proper standard of review. Just last term, the Supreme Court emphasized that "a reviewing court should try to break [] a [mixed] question into its separate factual and legal parts, reviewing each according to the appropriate legal standard." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1199 (2021). "[W]hen a question can be reduced no further," we determine in the context of the particular case whether answering the question "entails primarily legal or factual work" and then apply the corresponding standard of review. *Id.* (quoting *U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018)). And when it comes to the determination of past persecution, the factual and legal parts are separate and distinct.

That past persecution involves two separate inquiries is highlighted by the division of labor within the Department of Justice. When deciding whether an applicant has previously experienced persecution, the Department, acting through Immigration Judges and the Board of Immigration Appeals, first determines what happened (which is the fact question) and then whether that event or sequence of events meets the legal definition for persecution (which is the legal question). It assigns responsibility for answering both the factual and legal aspects of the mixed question to Immigration Judges, while

confining the Board of Immigration Appeals to deciding whether the facts as found by an Immigration Judge justify a particular legal conclusion about persecution. *See Z-Z-O-*, 26 I. & N. Dec. 586, 590-91 (B.I.A. 2015) ("[W]hether an asylum applicant has established an objectively reasonable fear of persecution based on the events that the Immigration Judge found may occur upon the applicant's return to the country of removal is a legal determination that remains subject to de novo review.").

That mode of analysis guides us in analyzing other mixed questions in immigration law as well. For example, when assessing whether a petitioner invoking the Convention Against Torture is entitled to relief, we must determine whether the petitioner has shown a likelihood of facing torture. That, too, we have said, is a "mixed question" with "two distinct parts … : (1) what is likely to happen to the petitioner if removed; and (2) does what is likely to happen amount to the legal definition of torture? … The first question is factual. … The second question, however, is a legal question." *Kaplun v. Att'y Gen.*, 602 F.3d 260, 271 (3d Cir. 2010).[2] And, again, that

---

[2] We have since steadfastly followed the *Kaplun* test. *See, e.g., Myrie v. Att'y Gen.*, 855 F.3d 509, 516 (3d Cir. 2017); *Green v. Att'y Gen.*, 694 F.3d 503, 507 (3d Cir. 2012); *Roye v. Att'y Gen.*, 693 F.3d 333, 338 (3d Cir. 2012); *Kang v. Att'y Gen.*, 611 F.3d 157, 164 (3d Cir. 2010). Other Courts of Appeals also treat the question of whether mistreatment satisfies the legal definition of torture as a mixed question of fact and law. *See, e.g., Ridore v. Holder*, 696 F.3d 907, 915-16 (9th Cir. 2012); *Turkson v. Holder*, 667 F.3d 523, 530 (4th Cir. 2012); *Gourdet v. Holder*, 587 F.3d 1, 5 (1st Cir. 2009);

distinction is one the Supreme Court has recently reinforced. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1693 (2020) (distinguishing between the "factual components" of CAT orders and the legal components).

We should bring that same analytical clarity to the question of past persecution when we consider a BIA order deciding an application for asylum. Unfortunately, in that context we have let ambiguity creep into our case law, and it has led to confusion about our standard for review.

It is not that we have always been unclear. On at least two occasions, we have stated unequivocally that persecution presents a mixed question of law and fact. *See Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 106 (3d Cir. 2020) ("Neither party disputes the facts underlying Petitioner's past-persecution claim. So we will review the BIA's application of our past-persecution standard to those facts de novo."); *Huang*, 620 F.3d at 382-83 (drawing expressly on the *Kaplun* test to hold that the question of "whether an alien possesses a well-founded fear of persecution," like the question of whether "what [the alien] is likely to suffer amounts to torture," is "a mixed question of fact and law … that requires application of a legal standard to a particular set of circumstances").[3]

---

*Jean-Pierre v. Att'y Gen.*, 500 F.3d 1315, 1316-17 (11th Cir. 2007).

[3] Several of our sister circuits also treat persecution as a mixed question. *See Zhou Hua Zhu v. Att'y Gen.*, 703 F.3d 1303, 1311-12 (11th Cir. 2013); *Ramdan v. Gonzales*, 479 F.3d 646, 648 (9th Cir. 2007); *Mirzoyan v. Gonzales*, 457 F.3d 217,

4

Those clear holdings, however, are sometimes misunderstood because of shorthand articulations of the standard that we have given elsewhere. For example, in *Voci v. Gonzales*, 409 F.3d 607 (3d Cir. 2005), we said, "[w]hether an asylum applicant has demonstrated past persecution or a well-founded fear of future persecution is a factual determination reviewed under the substantial evidence standard." *Id.* at 613. But even then, we followed the two-step analytical path described above, for we observed that, "[w]hile this Court has not yet drawn a precise line concerning where a simple beating ends and persecution begins, our cases suggest that isolated incidents that do not result in serious injury do not rise to the level of persecution." *Id.* at 615. That was an acknowledgement that, when judging a claim of past persecution, we are applying a legal standard to a set of facts.

The two-step analysis regularly features in our case law. *See, e.g., Doe v. Att'y Gen.*, 956 F.3d 135, 146 (3d Cir. 2020) ("In short, because the IJ and the BIA accepted Petitioner's testimony as true but then proceeded to misstate and ignore certain relevant aspects of that testimony, and because they committed legal error by finding that a single beating without severe physical injury to Petitioner was dispositive, their

---

220 (2d Cir. 2006); *Asani v. INS*, 154 F.3d 719, 723 (7th Cir. 1998). Those circuits that do not state a standard of review or have called it a fact question are still in practice applying a legal definition to a set of facts. *See, e.g., Arita-Deras v. Wilkinson*, 990 F.3d 350, 359 (4th Cir. 2021) ("We repeatedly have held that death threats qualify as persecution. . . . Thus, the Board committed legal error in concluding that Arita-Deras had not established past persecution.").

determination that his experience did not rise to the level of past persecution must be overturned." (internal quotation marks and citation omitted)); *Kibinda v. Att'y Gen.*, 477 F.3d 113, 120 (3d Cir. 2007) ("While we do not mean to suggest that the severity of an injury should be measured in stitches, Kibinda has provided no other objective evidence to demonstrate that the single injury he suffered was severe enough to constitute persecution under our stringent standard."); *Chavarria v. Gonzalez*, 446 F.3d 508, 520 (3d Cir. 2006) ("[T]he second threat experienced by Chavarria rises to the level of past persecution because it was both highly imminent, concrete and menacing and Chavarria suffered harm from it.").

So it should be apparent that persecution is not purely a question of fact. Nevertheless, we continue at times to create tension in our precedents with imprecise statements of our standard of review. For example, we recently said in *Thayalan v. Att'y Gen.*, 997 F.3d 132 (3d Cir. 2021), that past persecution is a question of fact subject to review for substantial evidence. *Id.* at 137. Then, in a well-intended effort to acknowledge that persecution is actually a mixed question of law and fact, but with language that might be taken (wrongly) as undercutting our perfectly clear statement in *Herrara-Reyes*, we said:

> In *Herrera-Reyes*, we applied de novo review to the question of whether the BIA misapprehended the legal methodology we have prescribed for assessing persecution. We concluded that it was legal error for the agency to examine incidents of alleged past persecution in isolation from each other rather than cumulatively and to restrict qualifying harm to that inflicted on the petitioner

6

herself, excluding harm to family members or close associates. In contrast, where the agency does not misapprehend applicable law, we apply the substantial-evidence standard to an agency determination that an alien did not suffer harm rising to the level of persecution even where the underlying facts about how an alien was mistreated are undisputed. We do so because the question of whether a particular fact pattern rises to the level of persecution is largely fact-driven.

*Id.* at 137 n.1 (internal quotation marks and citation omitted).

The question of past persecution is indeed largely fact-driven, in the sense that there is always a factual component to the question, although not always a factual dispute. But being "largely" something is not the same as being "entirely" something. And, when determining our standard of review, there is certainly no novel "misapprehension of law" element that we must find in the BIA's decision before we can review "the application of law to undisputed or established facts" for what it is: a "question of law." *Guerrero-Lasprilla*, 140 S. Ct. at 1069.

The two-step analysis for judging past persecution is straightforward, at least in concept, if not always in practice. Our precedent and that of the Supreme Court require us to address past persecution as a mixed question of law and fact, reviewing "its separate factual and legal parts, … each according to the appropriate legal standard[,]" *Google LLC*, 141 S. Ct. at 1199, even when we have occasionally been less than precise in framing the procedure as such. It is time we were clearer and more consistent on this important point.